UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY HERSON and EAST BAY OUTDOOR, INC. | No. C 09-04187 MHP |
| Plaintiffs, | **MEMORANDUM & ORDER** |
| v. | **Re: Defendant City of San Carlos' Motion for Summary Judgment** |
| CITY OF SAN CARLOS, | |
| Defendant. / | |

Plaintiffs Jeffrey Herson ("Herson") and East Bay Outdoor, Inc. ("East Bay Outdoor") (collectively "plaintiffs") filed this action against the City of San Carlos, California ("the City" or "San Carlos"). In their complaint, plaintiffs allege that the City violated plaintiffs' First Amendment right to freedom of expression by denying plaintiffs' building permit application to construct a billboard on a plot of land adjacent to Highway 101. Now before the court is the City's motion for summary judgment. Having considered the arguments of the parties and for the reasons stated below, the court enters the following memorandum and order.

BACKGROUND

As is necessary on a motion for summary judgment, the facts are set forth in the light most favorable to plaintiffs, the non-moving parties.

Herson, the owner of East Bay Outdoor, has worked in the outdoor sign business for the last 20 years. Docket No. 69 (Herson Aff.) ¶ 4. His business involves securing real estate parcels visible

from public thoroughfares, obtaining necessary permits from the local government to construct billboards on those parcels and leasing advertisement space on successfully constructed billboards. Docket No. 1 (Comp.) ¶ 7.

I.     Denial of Building Permit Application

On September 4, 2009, Herson sought permission from the City to construct a "pole sign" on property Herson had leased at 803 American Street, a parcel located within San Carlos and adjacent to Highway 101. Docket No. 59 (Nelson Dec.), Exh. A (Initial Permit Application) at 2. Herson went to the City Planning Department to file the building permit application, as required under the San Carlos Municipal Code in effect at the time ("the Prior Code"). Herson Aff. ¶ 3; Initial Permit Application. Herson was provided with a blank permit application by Gavin Moynihan ("Moynihan"), an Assistant Planner for the City who was manning the counter that day.[1] *Id.* Herson completed the application without leaving the Planning Department, attaching three pages of exhibits that provided greater information about the pole sign he wished to construct. *Id.* According to the exhibits, the proposed structure would be 50 feet tall, and support a two-sided advertising cabinet measuring 48 feet wide by 14 feet tall (672 square feet per side, 1344 square feet in total). *Id.* at 4. On one side of the billboard, Herson intended to display the message "Palin For President 2012," referring to Sarah Palin, the Republican party's vice-presidential nominee during the 2008 presidential election. *Id.* On the other side of the billboard, Herson sought to display the message "No on measure C November 4, 2012," referring, erroneously, to a ballot measure going before the voters in November 2009. *Id.* at 5.

Moynihan received Herson's application, and after quickly reviewing it, stepped away from the Planning Department counter to confer with the City's Planning Manager, Deborah Nelson ("Nelson"). Nelson Dec. ¶ 8. After she reviewed the application, Nelson concluded that the proposed sign was too large to be approved as a pole sign and believed it was actually a billboard prohibited by the Prior Code. *Id.* She advised that the application be denied for that reason. *Id.* When Moynihan returned to the counter, he informed Herson that his application had been denied. Herson Aff. ¶ 3. Herson asked Moynihan to write the reasons for the application's denial on the

2

application. *Id.* Moynihan wrote that the proposed structure was "NOT PERMITTED UNDER 18.150.070 BILLBOARD SIGNS NOT ADV. GOODS AND SERVICES ON PROPERTY." Initial Permit Application at 1.

II.     Relevant Provisions of the San Carlos Municipal Code

At the time Herson desired to erect his pole sign, the Prior Code placed varying restrictions on different types of signs. Comp., Exh. 1 (Prior Code) §§ 18.150.030-080.[2] As a general matter, the Prior Code prohibited the posting of any signs without City approval unless a particular type of sign was expressly exempted from the permit requirement. *Id.* § 030. In addition, certain types of signs, such as billboards, were categorically prohibited. *Id.* § 070. A billboard was defined as a sign "directing attention to any product, activity or service upon which such sign is located or to which it is affixed." *Id.* The City also prohibited, with certain exceptions, all off-site signs. *Id.* Off-site signs were defined as "[s]igns placed on property which do not represent goods, services, or activity conducted on the premises upon which the sign is located." *Id.* Those two provisions—prohibiting billboards and off-site signs—were the ones cited by Moynihan as the reasons for denying plaintiffs' permit.

"Pole signs," the type of sign/structure for which Herson applied, were not allowed unless such signs fit within specified size limits (discussed in detail below) and the poster obtained architectural review from the City. *Id.* § 060. Pole signs erected on freeway-oriented parcels could be larger than pole signs erected on other types of property. *Id.* § 080.A.2.

In contrast to the special allowances made for freeway-facing businesses, the Prior Code imposed special size and time restrictions upon temporary political signs. *Id.* § 065. Political signs, including any sign relating to any issue, ballot measure, political statement and expression, or candidate in any county, state or federal election, could not be posted 60 days prior to the referenced election and could not exceed 32 square feet. *Id.*

Under the Prior Code, the City could reject an application for architectural review if the City determined that the design of the proposed sign was inconsistent with the Prior Code. *Id.* § 035.G.7.

3

1  In addition, the City had discretion to reject proposals based on aesthetic and safety concerns. *Id.* §

2  030.B.  No time limits were imposed upon the City when reviewing a proposed sign.

3  III.     Subsequent Factual and Procedural History

4  Herson filed his complaint in this action on September 10, 2009, challenging the City's

5  denial of his building permit application.  His complaint sought damages, an injunction and

6  declaratory relief for violations of his First Amendment right to free speech under 42 U.S.C. section

7  1983, and violations of similar rights under the California Constitution.  Specifically, he complained

8  that, by denying the application for a pole sign, 1) the City subjected non-commercial political

9  speech, such as the content of his proposed sign, to greater time and size restrictions than other

10 forms of speech, and 2) the City's review procedures for proposed signs reflected an illegal prior

11 restraint of free speech.  Comp. ¶¶ 10-15.

12 This court granted a Temporary Restraining Order (TRO) on October 19, 2009, enjoining the

13 City "from enforcing the restriction on the size of political signs and the temporal limitations on the

14 display of political signs provided in San Carlos Municipal Code section 18.150.065 or enforcing

15 any other review, process or procedure provided in said section as preconditions to plaintiffs'

16 exercise of their free speech rights."  Docket No. 16 (TRO) at 2.  The TRO was granted because

17 there was a danger that Herson's First Amendment rights would be curtailed by constitutionally

18 infirm time, size and review restrictions disparately applied to political speech.  *Id.*  In addition, the

19 TRO vacated the denial of Herson's permit application, and deemed Herson's initial application

20 refiled for reconsideration.  *Id.*  The TRO did not, however, restrain the City from "exercising lawful

21 review of, and requiring a building permit for, any proposed structure to be built insofar as the

22 review and permit are for content-neutral purposes such as ensuring structural stability and safety."

23 *Id.*

24 In direct response to the TRO, on October 29, 2009, the City passed an urgency ordinance,

25 placing a 45-day moratorium prohibiting anyone from erecting a "Billboard Structure" so that the

26 City would have time to review the Prior Code.  Docket No. 18 (Herson Dec.), Exh. 1 (Urgency

27 Billboard Ordinance).  The urgency ordinance also amended the Prior Code to redefine the term

28

4

"billboard structures" as any structure subject to the City's safety codes that meets one of the following criteria: 1) it is intended to be used for, or is suitable for, the display of general advertising for hire; 2) it is intended to be used for, or is suitable for, the display of commercial advertising messages which pertain to products and/or services which are offered at a different location, or are not offered at the same location as the sign; or 3) it constitutes a separate principal use of the property, in contrast to an auxiliary accessory of the principal use of the property. *Id.* The urgency ordinance banned the erection of any new billboards meeting this definition. *Id.*

On November 10, 2009, the City took further corrective steps to repeal the Prior Code by enacting an amended version under the same chapter number. Docket No. 36 (Revised Code) at 5. The Revised Code drastically overhauled the Prior Code and corrected many, if not all, of the constitutional infirmities that this court had previously identified. The term "general advertising" in contrast to self-promotion advertising, was defined to mean: the business or enterprise of making a sign display face available to a variety of advertisers, whether they be businesses or other establishments. *Id.* § 020. This definition applied even when the display face was donated or made available at a reduced rate or for "in kind" consideration. *Id.* The City adopted a "message substitution clause" to prevent the government's inadvertent favoring of commercial speech over non-commercial speech, or the favoring of some non-commercial speech over other non-commercial speech. *Id.* § 015.G. The City excised the sections that disparately treated political signs by collapsing the category of political signs into temporary non-commercial signs more generally and removing permit requirements on such signs as long as they were smaller than 100 square feet. *Id.* § 040. Addressing the unfettered discretionary review procedures of the Prior Code, the City placed time limits upon the sign review procedures. *Id.* § 030. The City expressly prohibited the consideration of message content when reviewing the design of a sign. *Id.* § 015.H. In addition, the Revised Code included a severability clause in case any provision might be found to be invalid. *Id.* § 015. In light of the changes to the sign code made by the City, on March 5, 2010, the court granted the City's motion to dissolve the TRO. Docket No. 72 (Order).

Meanwhile, after the issuance of the TRO, Herson and the City had an extended correspondence over the completion of Herson's permit application. Nelson Dec. ¶¶ 16-50. Though Herson filed a number of supporting documents in piecemeal form, his application was never deemed complete by the City and was ultimately denied in its incomplete status on January 25, 2010. Nelson Dec. ¶ 90; *id.*, Exh. DD (Denial Letter). Herson's resubmitted incomplete application was denied for three reasons under the Revised Code. Denial Letter at 1. The proposed sign was denied because it exceeded the size limits on pole signs; it met the definition of a prohibited billboard sign intended for general advertising; and the application was incomplete due to missing documentation. Denial Letter at 3. Plaintiffs had an opportunity to appeal this denial with the City, but do not appear to have done so as of this date. *Id.* Plaintiffs contend that they have met all of the standards required by the City.

LEGAL STANDARD

Summary judgment is proper when the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the proceedings. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Mere allegations or denials do not defeat a moving party's allegations. *Id.*; *see also Gasaway v. Northwestern Mut. Life Ins. Co.*, 26 F.3d 957, 960 (9th Cir.1994). The court may not make credibility determinations and inferences drawn from the facts

6

must be viewed in the light most favorable to the party opposing the motion. *Anderson*, 477 U.S. at 249; *Masson v. New Yorker Magazine*, 501 U.S. 496, 520 (1991).

DISCUSSION

In their complaint and moving papers, plaintiffs raise at least two distinct challenges to the San Carlos sign ordinance arising out of the City's denial of the building permit. First, plaintiffs assert that San Carlos' sign ordinance violates the First Amendment by providing greater protection to commercial than noncommercial speech and by regulating noncommercial speech based upon the content of speech. Second, plaintiffs claim that the San Carlos sign ordinance represents a prior restraint on speech, in violation of the First Amendment, by vesting unbridled discretion to deny speech-related permits in city officials and by not imposing adequate time limits for city officials to make decisions related to such permits.

In response, the City primarily argues that plaintiffs lack standing to challenge any of the municipal code provisions about which they complain. Specifically, the City contends that, because the City was legally entitled to deny plaintiffs' building permit application based on the Prior Code's valid and constitutional size and height restrictions for pole signs, any injuries plaintiffs may have suffered pursuant to other code provisions are not redressable. If plaintiffs do, in fact, lack standing to pursue this litigation, this court cannot exercise its jurisdiction. *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 707 (9th Cir. 2009) (holding that the jurisdictional requirement of standing can be raised at anytime). Accordingly, the court addresses defendant's standing-related arguments at the threshold.

I.  Standing

To have standing under Article III of the Constitution, a plaintiff must demonstrate, at an

> "irreducible minimum" . . . 1) an injury in fact which is "actual, concrete, and particularized"; 2) a causal connection between that injury and the defendant's conduct; and 3) a likelihood that the injury can be redressed by a favorable decision of the court.

*Get Outdoors II, LLC v. City of San Diego*, 506 F.3d 886, 891 (9th Cir. 2007) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Beyond Article III standing, a plaintiff must

7

ordinarily establish "prudential standing," which requires that a plaintiff demonstrate that his claim "is sufficiently individualized to ensure effective judicial review." *Id.* (citing *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 11 (2004)).  However, when a plaintiff asserts an overbreadth claim under the First Amendment, the prudential standing requirement is suspended or relaxed "because of the special nature of the risk to expressive rights." *Id.* (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)).  "An overbreadth claim is essentially a claim that a statute may be constitutional as applied to the plaintiff but sweeps so broad as to unconstitutionally suppress the speech of others not before the court." *Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 907 (9th Cir. 2007).  Plaintiffs' moving papers and complaint do not appear to assert such a claim.[3]  Accordingly, plaintiffs must satisfy both the Article III and prudential standing requirements.

### A.     Injury and Causation

In circumstances like those presented in the instant case, the Ninth Circuit has held that a plaintiff only suffers injury and establishes causation with respect to sign ordinance provisions that were actually applied or that a municipality has explained "would certainly be used against" the plaintiff to deny a sign permit. *See Get Outdoors II*, 506 F.3d at 892.  Plaintiffs appear to assert three First Amendment injuries—1) the denial of their permit application, 2) being subjected to an unconstitutional content-based ban on speech and 3) being subjected to an unconstitutional prior restraint.  The court must determine which provisions, if any, potentially caused those injuries

Only three provisions of the Prior Code were relevant to the City's denial of plaintiffs' permit application.  The first two were explicitly cited by the City as the reasons for denying plaintiffs' application: 1) the City's prohibition on billboards, pursuant to Prior Code section 070, and 2) the prohibition on off-site advertising, also pursuant section 070.  The City has also submitted a declaration from Nelson, the Planning Manager and the individual who instructed Moynihan to deny plaintiffs' permit application, that at the time, she remarked to Moynihan that the permit should also be denied because plaintiffs' proposed pole sign exceeded the City's size and height restrictions on pole signs.  Nelson Dec. ¶ 8.

8

Because those three provisions are the only sections of the code upon which the City actually relied in denying plaintiffs' permit application, plaintiffs must establish standing—injury, causation and redressability—with respect to those provisions. Plaintiffs may not challenge any other provisions of the Prior Code because none of those provisions, including the restrictions on political speech, caused them injury. That plaintiffs may have standing to challenge the provisions of the sign ordinance that caused their injury "does not provide [them] with a passport to explore the constitutionality of every provision of the [sign ordinance]." *Covenant Media of S. Car., LLC v. City of N. Charleston*, 493 F.3d 421, 429 (4th Cir. 2007); *see Get Outdoors II*, 506 F.3d at 893 ("Get Outdoors II cannot leverage its injuries under certain, specific provisions to state an injury under the sign ordinance generally.").

### B. Redressability

The court must further determine whether the injuries suffered by plaintiffs as a result of the application of the three above-discussed code provisions are redressable. In this context, *Get Outdoors II* guides the court's analysis. In that case, the Ninth Circuit held that the plaintiff had sufficiently established injury and causation under two provisions of San Diego's sign ordinance—a ban on offsite advertising and limits on the size and height of billboards. *Id.* at 892. Relying upon a Seventh Circuit decision, *Harp Advertising Illinois, Inc. v. Village of Chicago Ridge*, 9 F.3d 1290 (7th Cir. 1993), the Ninth Circuit found that the plaintiff's injuries could only be redressed by a decision that invalidated *all* of the provisions that the plaintiff asserted caused their injury. *Get Outdoors II*, 506 F.3d at 893 ("We find that Get Outdoors II's injuries under the substantive provisions of the City's sign regulations would be redressed by a decision from the court that invalidated both the size and height restrictions as well as the off-site ban."). Importantly, the court noted that "because standing is addressed on a claim by claim basis, an unfavorable decision *on the merits* of one claim may well defeat standing on another claim if it defeats the plaintiff's ability to seek redress." *Id.* at 893 (emphasis added). After determining on the merits that San Diego's size and height restrictions did not violate the First Amendment (and thus caused plaintiff no injury), the court held that the plaintiff's other alleged injuries were not redressable, and that, therefore,

9

plaintiffs lacked standing. *Id.* at 893-94; *see also Boulder Sign Co., LLC v. City of Boulder City*, 281 Fed. Appx. 701, 702-03 (holding that plaintiff-billboard company lacked standing where the billboards for which it sought permits exceeded the city's valid size and height rules, meaning that no change in the law would result in the approval of the permits). Accordingly, the court dismissed plaintiff's facial and as applied challenges to the size and height restrictions, the ban on off-site advertising and the existence of an unconstitutional prior restraint.

*Get Outdoors II*'s analysis of redressability applies to plaintiffs' claims in the instant case. If any of the provisions that the City proffered as justifications for denying plaintiffs' permit application are constitutional, plaintiffs will lack standing to challenge the other, potentially unconstitutional provisions. With this in mind, the court examines whether the Prior Code's size and height restrictions on pole signs are constitutional.

II.   <u>Size and Height Restrictions on Pole Signs</u>

With the above framework in mind, the court turns to the merits of plaintiffs' challenge to the Prior Code's size and height restrictions. Assuming, *arguendo*, that neither the billboard nor the off-site advertising prohibitions were constitutional, plaintiffs have standing to challenge the size and height limitations; the restrictions were the direct cause of plaintiffs' injuries and the court could redress that injury by enjoining the application of the restrictions.

The City asserts, however, that its size and height restrictions on pole signs are valid, and that it was therefore entitled to deny plaintiffs' permit application on grounds that it exceeded the size and height limitations for "pole signs." San Carlos "has adopted a sign ordinance that makes one's head spin to figure out the bounds of its restrictions and exemptions." *Reed v. Town of Gilbert*, 587 F.3d 966, 974 (9th Cir. 2009). The court does its best to unravel its nearly unintelligible provisions. The Prior Code, under which the City initially denied plaintiffs' application, defined a pole sign as "a sign attached or suspended from a pole or post which is imbedded in the ground." Prior Code § 060.A. The same provision explained that "[f]reestanding pole signs shall be no taller than twenty-five feet except as permitted under Section 18.150.080(A)(2) at their uppermost top edge measured from the surrounding grade level below."

*Id.* The pole sign provision contained no explicit restriction on the size of any signs attached to a pole or post. However, the pole sign provision was located within subsection A of section 060 of the sign ordinance. Section 060 generally regulated permanent signs (of which a pole sign is a species). Subsections B and C of section 060, which applied to all permanent signs discussed in subsection A, delineated the maximum allowable permanentسign area permitted on various types of property. Prior Code § 060.B & C. For example, for properties in the Commercial and Industrial Zones and Airport Zones of San Carlos, an individual tenant occupancy was permitted to have a maximum of five permanent signs on the property with a maximum combined sign area of one hundred square feet; a multitenant occupancy in those same zones could have one sign per tenant (plus one sign shared by the tenants) with a maximum combined sign area of one hundred square feet per tenant. Under sections 060.B and C, no individual sign's area could exceed one hundred square feet. As far as the court can discern, these sign area restrictions limited the size of pole signs.

The Prior Code, however, had special size and height rules for freeway-oriented parcels.[4] Section 080.A.1 allowed the Planning Commission to grant a request for up to a fifty percent increase in the maximum available sign area for a freeway-oriented parcel, provided that 1) the business is dependent on public patronage from freeway traffic, 2) the sign area bonus is used on the portion of the property adjacent to the freeway and 3) the property had not already received a sign area bonus pursuant to section 080.A.4 (discussed below). *See* Prior Code § 080.A.1. Read in context with the other provisions of the ordinance, it appears that the fifty percent increase only applied to the maximum allowable sign area pursuant to section 060.B and C, which as discussed, above provided for 100 square feet of sign area per parcel.

Section 080.A.2, which is most relevant in this case, permitted the Planning Commission to grant a freeway-oriented parcel the right to construct an additional, single, freestanding pole or monument sign. The sign area for one of these specially permitted pole or monument signs was not counted against the property's 100-square foot sign area restrictions under section 060 B and C. For a freeway-oriented parcel occupied by a single business, total sign area for a pole or monument sign permitted under section 080.A.2 could not exceed 200 square feet per side (400 square feet total).

11

Pursuant to section 080.A.4, however, the Planning Commission could, under certain circumstances, enlarge the maximum total sign area for a pole or monument sign on a freeway-oriented parcel up to a total of 600 square feet for a property with two businesses and up to a total of 900 square feet for a property with three businesses. Finally, section 080.C provided that the Planning Director could, upon application, grant an additional twenty-five percent increase in sign area on any given property, provided the applicant met certain circumstances. The Prior Code did not make clear whether the twenty-five percent increase under section 080.C applied to pole or monument signs permitted under section 080.A. As for height, pole signs permitted pursuant to section 080.A.2 could not exceed a maximum height of 40 feet, although section 080.A.3 permitted the Planning Commission to grant an exception to the height limitation, not to exceed 65 feet.

Thus, reading the Prior Code as a whole, the largest possible pole sign that any individual or entity could construct would be 65 feet tall and have a sign area of 1125 square feet total or 562.5 square feet per side. Such a sign could only be constructed on a freeway-oriented parcel with three or more businesses that received permission, pursuant to section 080.A.4, for a twenty-five percent increase in their sign area allowance.[5]

        1.      <u>Constitutionality of the Size and Height Restrictions</u>

There is no dispute in the instant case that the structure for which plaintiffs sought a building permit was a pole sign and that its proposed dimensions (48 feet by 14 feet on two sides, for a total of 1344 square feet) exceeded the maximum allowable size for a pole sign. Neither party, however, clearly addresses whether the City was entitled to restrict the size and height of pole signs in the manner it chose. Ordinarily, "[s]ize and height restrictions on billboards are evaluated as content-neutral time, place and manner regulations." *Get Outdoors II*, 506 F.3d at 893. "A content-neutral time, place, and manner restriction is permissible so long as it is 'narrowly tailored to serve a significant government interest, and leave[s] open ample alternative channels of communication.' " *Flint v. Dennison*, 488 F.3d 816, 830 (9th Cir. 2007) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)). Specifically, the regulations must not be

12

"substantially broader than necessary to protect the city's interests." *See Members of the City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 808 (1983).

The Prior Code's size and height restrictions were content-neutral. "[W]hether a statute is content neutral or content based is something that can be determined on the face of it; if the statute describes speech by content then it is content based." *Menotti v. City of Seattle*, 409 F.3d 1113, 1129 (9th Cir. 2005) (quoting *City of L.A. v. Alameda Books, Inc.*, 535 U.S. 425, 448 (2002) (Kennedy, J., concurring)) (internal quotation marks omitted). Here, the maximum size and height requirements do not discriminate, on their face, between the content of speech. Regardless of the type of speech expressed upon a pole sign (commercial, non-commercial or political), the relevant provisions of the Prior Code did not permit any pole sign with the dimensions proposed by plaintiffs. To be certain, other provisions of the sign ordinance (for example, the prohibition in section 070 on off-site signs) and even certain language within section 080.A.2, discriminate on the basis of the content of the speech presented on a pole sign. For example, it appears that under the Prior Code, an individual or entity would have been barred from erecting a pole sign of any size that contained political speech (or any other form of non-commercial speech). However, *Get Outdoors II* instructs that other provisions are irrelevant in determining whether the size and height restrictions were valid, content-neutral, time, place and manner restrictions that independently justified the denial of plaintiffs' application. Because the size and height limitations, standing alone, did not discriminate on the basis of content, they are content-neutral.

Moving to the City's justification for the size and height restrictions, courts have consistently found that municipalities have a significant government interest in enhancing the aesthetic appearance of the town and protecting the safety of its inhabitants. *See Taxpayers for Vincent*, 466 U.S. at 808 (holding that aesthetics constitutes a significant government interest); *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507-09 (1981) (holding that traffic safety functions as a significant government interest). Here, the Prior Code explicitly stated that it was intended to "[e]nhance the physical appearance of the City, create a more attractive economic and business climate, and preserve the public health, safety and welfare of its citizens[; r]educe hazards that may

13

be caused by signs projecting over public rights-of-way[; and p]reserve and enhance the aesthetic, traffic safety, and environmental values of the community . . . , while at the same time providing channels of communication to the public" Prior Code § 010 (Purpose). The measures adopted by the City—which generally minimized the size of pole signs and limited large pole signs to freeway-oriented parcels—served the City's interests in aesthetics and safety. *See Get Outdoors II*, 506 F.3d at 864.

Finally, because the size and height restrictions do not foreclose other, viable means of communication—"indeed, they stop short of banning all [pole signs]," *id.* at 894—they leave open ample alternative channels of communication. Accordingly, the court holds that the size and height limitations on pole signs in the Prior Code are valid time, place and manner restrictions.

III.     Plaintiffs' Remaining Claims

The conclusion that the size and height restrictions are valid time, place and manner restrictions dooms all of plaintiffs' remaining claims. Because the size restriction validly precluded the issuance of permits for plaintiffs to construct their proposed pole sign, they suffered no injury as a result of that provision's application. And because the city was entitled to reject plaintiffs' permit pursuant to the size restriction, plaintiffs' other claims are not redressable. For even if the court were to enjoin the other provisions of the Prior Code about which plaintiffs complain—the off-site advertising ban, preference for commercial over non-commercial speech, lack of durational limitations and lack of constraints on city officials' discretion—plaintiffs' pole sign application would have been denied. The pole sign for which plaintiffs sought a permit had a sign area larger than the maximum sign area permissible for any pole sign. Officials working for the Planning Department lacked the discretion to grant the permit application filed by plaintiffs. Pursuant to *Get Outdoors II*, if a provision of a municipal code "validly prohibits the construction of proposed billboards," a plaintiff does not have standing to challenge other, potentially unconstitutional provisions of that same code, even if the municipality also relied upon those provisions to justify its denial of a permit. 506 F.3d at 894. No changes to the Prior Code would have provided plaintiffs with the relief they seek: the granting of a permit to construct a billboard. *Id.* at 895 ("No change in

14

the permit procedure would result in the approval of the permits [the plaintiff] requests."); *see also Get Outdoors II, LLC. v. City of El Cajon*, No. 03-cv-1437, 2007 WL 4170230 (S.D. Cal. Nov. 20, 2007) (dismissing, without reaching the merits, claims that a sign ordinance was content-based, discriminated in favor of certain speech, and lacked necessary procedural safeguards once court concluded that city had validly denied billboard permits based on size and height restrictions). Nor are plaintiffs entitled to even nominal damages under such circumstances. *See Get Outdoors II*, 506 F.3d at 895 (rejecting any claim for damages where plaintiff lacked standing).

None of the cases relied upon by plaintiffs compel a different conclusion. Plaintiffs primarily cite to a number of decisions holding that a municipality cannot moot First Amendment damages claims by amending an unconstitutional ordinance so that it complies with the First Amendment. *See, e.g., Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 902 (9th Cir. 2007) (cited repeatedly by plaintiffs and holding that repeal of an unconstitutional ordinance does not moot a plaintiff's claim for First Amendment damages). But plaintiffs fail entirely to grapple with the City's standing arguments. Nowhere in their brief do they discuss whether the sign area limitation on pole signs is a valid time, place and manner restriction or whether the sign they proposed violated that provision. Plaintiffs repeat (over and over again) that because the sign could have been prohibited by the City pursuant to unconstitutional provisions of the Prior Code (such as the restrictions on political speech), plaintiffs have standing. *Get Outdoors II* instructs otherwise. Without satisfying the threshold standing issue, the court need not address any of plaintiffs' other contentions.

Further, plaintiffs read far too much into this court's granting of the earlier and now dissolved TRO. In no way, shape or form did the court's TRO hold, as plaintiffs suggest, "that the City violated Plaintiffs' constitutional rights on September 4, 2009 . . . ." Docket No. 69 (Pls.' Opp'n) at 5. In granting the TRO, the court merely held that, given the record before the court, plaintiffs' had a likelihood of prevailing on the merits of their claims. That finding was based, in particular, on the Prior Code provision that facially discriminated against political speech. The closer examination of this action afforded to the court on the City's motion for summary judgment

15

has shown that, even viewing the record in the light most favorable to plaintiffs, plaintiffs were not injured by the application of the City's size restriction on pole signs, and that therefore, plaintiffs lack standing to challenge any of the other provisions about which plaintiffs complain. No speaker attempting to engage in any type of speech (political, non-commercial or commercial) could have spoken in the manner that plaintiffs sought (a 1344 square foot billboard).[6]

\*\*\*\*

In summary, the City did not violate plaintiffs' First Amendment rights because it was entitled to deny plaintiffs' permit application on the grounds that plaintiffs' proposed pole sign exceeded the City's valid time, place and manner restrictions on the size of pole signs. As a result, no decision of this court enjoining the enforcement of other, potentially unconstitutional provisions of the Prior Code could redress the injury suffered by plaintiffs. Therefore, plaintiffs lack standing to pursue their content-based discrimination and prior restraint claims.

CONCLUSION

For the foregoing reasons, defendant City of San Carlos' motion for summary judgment is GRANTED.

IT IS SO ORDERED.

Dated: June 1, 2010

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

**ENDNOTES**

1. The parties dispute what transpired at the counter. Moynihan submitted a declaration stating that Herson approached the counter with a completed building permit application in hand and said to Moynihan "I need you to deny this permit." *See* Docket No. 27 (Moynihan Dec.) ¶¶ 6-7. Herson, however, has submitted a declaration that he had never been to the Planning Department prior to September 4, 2009, that he approached the counter and asked for a building permit application, that he completed and submitted the application on the spot, that he never asked Moynihan to deny the application, and that he merely requested that Moynihan write the reasons for denying the application on the face of the application. Herson Aff. ¶ 3. At this stage of the litigation, the court must view all disputed facts in favor of plaintiffs, the non-moving party. Accordingly, for purposes of this motion, the court adopts Herson's version of the events of September 4, 2009.

2. Unless otherwise indicated, all references to the Prior Code consist of only the last three digits of the code provision, as all provisions in the Prior Code begin with the 18.150 designation.

3. Even if plaintiffs' complaint or moving papers were construed to assert an overbreadth claim, it would not change the court's conclusions, discussed below. Plaintiffs asserting an overbreadth claim must still establish Article III standing. *See Get Outdoors II*, 506 F.3d at 891.

4. The sign ordinance implicitly defines a freeway-oriented parcel as a parcel "with frontage adjacent to U.S. 101, Skyway Road or Shoreway Road." Prior Code § 18.150.080.A.1.

5. There is a separate section of the San Carlos Municipal Code that permits the granting of a variance upon a qualifying application. If a variance were granted, it is conceivable that someone could build a pole sign with a sign area larger than 1125 square feet and a height of greater than 65 feet. However, plaintiffs in this case did not apply for a variance, nor have they shown that a variance for such a structure has ever been granted.

6. Plaintiffs' claims under the free speech provisions of the California Constitution also fail. Plaintiffs have not demonstrated that, in this context, the California Constitution provides any greater protection to speech.